1  Michael A Hirst, Esq. CA Bar #131034
   michael.hirst@hirstlawgroup.com
2  HIRST LAW GROUP, P.C.
   200 B Street, Suite A
3  Davis, CA 95616
   Tel: (530) 756-7700
4  Fax: (530) 756-7707

5

   Mark A. Kleiman, Esq. CA Bar #115919
6  mkleiman@quitam.org
   LAW OFFICES OF MARK KLEIMAN
7  2907 Stanford Avenue
   Venice, CA 90292
8  Tel: (310) 306-8094
   Fax: (310) 306-8491
9

   Attorneys for Plaintiff-Relators
10 Richard Ricks and John Doe

**FILED**

MAR 19 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
       DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

2:13-CV-0539 KJM AC

UNITED STATES OF AMERICA ex rel.
RICHARD RICKS AND JOHN DOE,

Plaintiffs,

v.

MENLO WORLDWIDE GOVERNMENT
SERVICES, LLC, CON-WAY INC., ESTES
FORWARDING WORLDWIDE LLC, ESTES
EXPRESS LINES, and DOES 1 through 10,

Defendants.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Complaint filed under seal

Plaintiffs Richard Ricks and John Doe, through their attorneys Hirst Law Group, P.C., and Law Offices of Mark Kleiman, on behalf of the United States of America, allege as follows:

## I. NATURE OF THIS ACTION

1. This action alleges that, since 2007 and continuing, Defendants Menlo Worldwide Government Services, LLC, Con-way Inc. (hereafter collectively "Menlo"), Estes Forwarding Worldwide LLC, and Estes Express Lines (hereafter collectively "Estes") have knowingly submitted, caused the submission of, and conspired to submit, false and fraudulent claims to the United States for the transportation of freight. In their work under the Defense Transportation Coordination Initiative, Defendants have defrauded the government by charging higher rates for transporting freight by air, along with frequently higher air fuel surcharge rates, when the freight was actually transported by ground. In addition, Menlo has defrauded the government by knowingly failing to perform its contractual duties to monitor and coordinate freight shipments for the benefit of the government and to ensure that the shipment costs billed to the government are reasonable. Through their conduct, Defendants have received substantial reimbursement to which they are not entitled.

2. Defendants' knowing submission of false and fraudulent claims for payment constitutes a violation of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA" or "Act"). As a result of their fraudulent conduct, Defendants have caused the United States to sustain a direct loss of funds and damage to its interests.

3. The FCA was originally enacted at the request of President Lincoln during the Civil War, when the president believed that the Union Army was being defrauded by contractors. The Act was substantially amended by Congress in 1986 and 2009 to enhance the government's ability to recover losses sustained as a result of fraud. At those times, Congress determined that fraud against the government was pervasive and that the FCA, which Congress described as the primary tool for combating government fraud, was in need of reform. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecute fraud on the government's behalf.

4. Among other things, the FCA prohibits knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and conspiring to defraud the government. 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), (a)(1)(C). Additionally, it prohibits knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing, or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government. 31 U.S.C. §§ 3729(a)(1)(G). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the loss sustained by the United States. 31 U.S.C. § 3729(a); 64 Fed. Reg. 47099, 47103 (1999).

5. The statute allows any person having information about an FCA violation to bring an action on behalf of the government and to share in any recovery obtained. The Act requires that the complaint be filed under seal for a minimum of 60 days, without service on the Defendants during that time, to allow the government time to conduct its own investigation and to determine whether to join the suit.

6. Based on the FCA, qui tam plaintiffs Richard Ricks ("Ricks") and John Doe, collectively "Relators" or "Plaintiffs," seek to recover all available damages, civil penalties, and other relief for the violations alleged herein, in every jurisdiction to which the Defendants' misconduct has extended.

II. PARTIES

7. Relator Richard Ricks is a United States citizen who resides in California. He is the former President and Chief Executive Officer of EXP Logistics Solutions, Inc. ("EXP"). EXP was a subcontractor to Menlo for air shipments under the DTCI Contract during the period August 2008 to December 2009, when Menlo replaced EXP with Estes.

8. Relator John Doe is a United States citizen and has direct and personal knowledge of the matters alleged herein.

9. Defendant Menlo Worldwide Government Services, LLC, is a limited liability

company established in Delaware, registered to do business in California as well as other states, and upon information and belief, is a subsidiary of Con-way Inc., a public-traded company listed on the New York Stock Exchange. Menlo's principal office in California is located at 2855 Campus Drive, San Mateo, California.

10. Defendant Con-way Inc., is a Delaware corporation with headquarters located at 2211 Old Earhart Road, Suite 100, Ann Arbor, Michigan.

11. Defendant Estes Forwarding Worldwide LLC, is a limited liability company established in Virginia on April 6, 2007. Its principal office is located at 1100 Commerce Road, Richmond, Virginia. Upon information and belief, it is a subsidiary of Estes Express Lines.

12. Defendant Estes Express Lines is a family owned and operated freight transportation provider incorporated in Richmond, Virginia. Its principal office is located at 3901 West Broad Street, Richmond, Virginia.

13. The identities of the remaining Doe Defendants who have knowingly submitted false and fraudulent claims to the government are presently unknown to Relators. All listed Defendants and such additional Doe Defendants served as contractors, agents, partners, and/or representatives of one and another in the fraud, concealment, and submission of false and fraudulent claims, as well as the wrongful retention of overpayments, and were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein.

## III. JURISDICTION AND VENUE

14. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

15. Under 31 U.S.C. § 3730(e), there has been no public disclosure of the allegations or transactions in this Complaint. To the extent there has been any such disclosure, Relators Ricks and John Doe constitute "original sources" pursuant to 31 U.S.C. § 3730(e)(4). Prior to any public disclosure, Ricks and John Doe voluntarily disclosed to the government the information on which the allegations or transactions discussed herein are based; they have

knowledge independent of, and that materially adds to, any publicly disclosed allegations or transactions; and this information was provided to the government before this action was filed.

16. Personal jurisdiction and venue are proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a), as one or more of the Defendants or their agents can be found, reside, transact business, or otherwise engaged in fraudulent conduct within the district.

## IV. BACKGROUND

### A. Defense Transportation Coordination Initiative

17. The Defense Transportation Coordination Initiative ("DTCI") is an initiative by the United States Department of Defense ("DOD") to manage distribution of freight in the continental United States. According to the Defense Industry Daily of August 26, 2007, the DTCI was focused on increasing operational effectiveness, while simultaneously obtaining efficiencies. Quoting from the Defense Industry Daily: "The premise is for DoD to competitively award a long-term contract with a world-class transportation coordinator/ coordinator(s) that will help it achieve these goals, leveraging current commercial capabilities and proven practices, save up to 20% as it manages, consolidates, and optimizes freight movement." *http://www.defenseindustrydaily.com/dtci-changing-military-shipping-in-the-usa-and-beyond-03650.*

### B. Contract Awarded to Menlo Worldwide Government Services, LLC

18. The U.S. Transportation Command announced the awarding of the DTCI contract, HTC711-07-D-0032, ("the Contract") on August 17, 2007, to Menlo Worldwide Government Services, LLC. The Contract was to manage DOD freight movements in the continental U.S. with the goal of maximizing efficiencies and reducing costs. *http://www.transcom.mil/news/read.cfm?id=7323.*

19. The Contract is a Federal Acquisition Regulation ("FAR") Part 15, indefinite-delivery, requirements-type contract, which includes fixed-price, cost-reimbursement, award fee, and award term-option provisions. *DTCI - Billing-Payment-Audit Plan*, Version 1.0, November 30, 2007, at 4. The Contract was valued at $1.76 billion and consists of a three-year base period,

with four option years. *DOD IG Report 2012-108*, at i.

### C. Contract Requirements Pertaining to Transportation Services

20. Menlo's management services under the Contract are reimbursed on a fixed-fee basis. However, the transportation of freight under the Contract is paid on a cost-reimbursement basis, to allow the government to directly benefit from any cost savings associated with freight shipment. The payment plan utilizes the DOD Third Party Payment System.

21. Under the freight transportation provisions in the Contract, the government submits a request for transportation utilizing an Electronic Data Interchange. Menlo responds to the request electronically with the estimated shipment charges comprised of: (1) the appropriate not-to-exceed ("NTE") transportation rate; (2) applicable accessorial charges for services beyond normal pickup and delivery per the fixed rates set forth in the contract; and (3) the calculated fuel surcharge allowances per the policy/procedures defined in the Contract. The NTE rates were negotiated between Menlo and the government and represent the maximum allowable costs under the contract. There are separate fuel surcharge rates for ground and air transportation, and these rates frequently change based upon the price of fuel. The costs for transportation services are provisionally paid and subject to post-payment Contract audit for allowable cost determination in accordance with the Contract provisions. *DTCI Billing-Payment-Audit Plan*, November 30, 2007, at 4 through 13.

22. DOD cargo can be moved through a variety of modes, including by air, motor, rail, water, and pipeline. Motor transportation may be by a complete truck load or less than a truckload ("LTL"). Material shipped by LTL is typically combined with other LTL shipments. Menlo's transportation coordination services include, but are not limited to, determining the appropriate mode based on the freight characteristics, equipment type, and the mandatory delivery date. *Contract HTC711-07-D-0032*, at 29.

23. Contract Line Item Number ("CLIN") 2 pertains to the transportation services. The Contract specifies that payment for these services will be based upon actual costs, up to the NTE rates that were negotiated between the government and Menlo prior to contract award. *Contract HTC711-07-D-0032*, at 3. Since the Contract deviates from certain Cost Accounting Standards

and FARs pertaining to cost reimbursement, the Contract provisions describe the treatment of reimbursable costs under the Transportation CLIN. Contract HTC711-07-D-0032, at 95. One such provision specifies the allowability of transportation costs under the Contract:

A cost is allowable only when the cost complies with all of the following requirements:

(I) *Reasonableness.*
(ii) Allocability.
(iii) Generally accepted accounting principles and practices appropriate to the circumstances.
(iv) Term.

*Contract, Part I, Section H-10(d)(1)* (emphasis added).

24. The contract further specifies how to determine reasonableness:

Determining Reasonableness

*A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business.* Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. *No presumption of reasonableness shall be attached to the incurrence of costs by a contractor.* If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

*What is reasonable depends upon a variety of considerations and circumstances, including*

(1) *Whether it is the type of cost generally recognized as ordinary and necessary for* the conduct of the contractor's business or *the contract performance*;

(2) *Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;*

(3) *The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large*; and

(4) Any significant deviations from the contractor's established practices.

*Contract, Part I, Section H-10*(e) (emphasis added).

25. Contract provisions also provide that Menlo is responsible for the accounting of its costs, including demonstrating that the costs are reasonable:

Auditing

(1) The contractor is responsible for accounting for costs consistently and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, *are reasonable*, allocable to the contract, and *comply with the statements in the applicable special provisions herein.*

Complaint filed under seal                                   6

*Contract, Part I, Section H-10(h)* (emphasis added).

26. In addition, the contract specifies how the contractor will submit invoices for actual costs when the mode of transportation changes:

> The contractor shall invoice for the actual cost of transportation, taking into consideration any achieved optimization opportunities, up to the transportation NTE rate established in the BoL, *or the revised transportation NTE rate if a mode change results.*

*Contract, Part I, Section G-7* (emphasis added).

### D. Defense Transportation Regulations

27. The Defense Transportation Regulation 4500.9-R, Part II, Cargo Movement, Chapter 213, prescribes responsibilities and procedures involving shipments under the DTCI Contract. The regulation sets forth several operating provisions applicable to Menlo's work and billing under the Contract, including the following:

> Mode determination based on stated shipper requirements and the Mandatory Delivery Date (MDD).
>
> (1) DTCI's PWS [Performance Work Statement] directs the Coordinator [Menlo's responsible staff persons who manage the shipments] to select the mode based on the MDD, therefore, the shipper [government personnel] will no longer identify a transportation mode (truck, rail, and air) prior to offering the shipment for movement. DTCI is considered a Mode Neutral Program since the shipper only determines when the freight must arrive at its next destination using only a MDD. *Based on the MDD and other requirements (e.g., accessorial) submitted by the shipper through the shipper system, the Coordinator will select the most efficient transportation mode to meet the shipper's requirement.* In the event the shipment must be delivered the same day or next day, expedited service will be used. Expedited service does not always mean the shipment must travel by air. *In many cases, surface transportation can be used to meet the delivery requirement at a much-reduced cost to the Government.*

*Defense Transportation Regulation 4500.9-R, Part II, Chapter 213, § B.1.c.(1)* (effective July 2008) (emphasis added).

28. Additional provisions specify that Menlo's Coordinator will notify the government shipper as to the actual carrier of the shipment:

> The DTCI Coordinator may employ multi-brokering of freight to achieve required efficiencies of the program. *The Coordinator is responsible for notifying the shipping activity concerning carriers load schedules (e.g., which carrier gets loaded).* This is accomplished using EDI [Electronic Data Interchange] 220 DTCI Transportation Service Responses from the Coordinator. *The 220 returned to the shipper will show the actual carrier's SCAC [Standard Carrier Alpha Code] and any equipment identifiers.*

Complaint filed under seal                    7

*Defense Transportation Regulation 4500.9-R, Part II, Chapter 213, § E.3.b.(1)* (emphasis added).

29. The regulation also contains certain billing and payment requirements, namely that shipment costs are provisionally paid and subject to audit for allowability:

> Due to the unique nature of the DTCI shipment rating process and related FAR based cost reimbursement provisions incorporated into the DTCI contract, *the CO [government's Contracting Officer] will not have the capability to validate actual line-haul shipment costs. These costs will be provisionally paid (i.e., contingent liabilities) and subject to post-payment contract audit for allowable cost determination.*

*Defense Transportation Regulation 4500.9-R, Part II, Chapter 213, § E.8.c* (emphasis added).

### E. Federal Acquisition Regulations

30. The FAR sets forth rules that govern the United States' purchases of goods and services. The guiding principle of FAR is to deliver the "best value" product or service to the United States while maintaining the public's trust and fulfillment in public policy objectives. FAR 1.102(a). Under FAR, all participants must exercise "sound business judgment in providing the best value product or service to meet the customer's needs." FAR 1.102-1(d). "Best value" is defined as "the expected outcome of an acquisition that, in the government's estimation, provides the greatest overall benefit in response to the requirement." FAR 2.101.

### F. Certifications

31. Menlo is required to submit a Standard Form 1034, Public Voucher, containing the monthly Summary Invoice detail for DTCI shipment transactions for each applicable shipper location. *Contract, Part I, Contract Administration Data, Section G-7.* This form's certification states that:

> "Pursuant to authority vested in me, I certify that this voucher is correct and proper for payment."

## V. ALLEGATIONS

32. Relators incorporate by reference and reallege as though fully set forth herein all preceding paragraphs.

### A. False Billings for Shipment of Freight

33. Since 2007 and continuing, Defendants Menlo and Estes have knowingly submitted,

Complaint filed under seal                    8

caused the submission of, and conspired to submit false and fraudulent claims to the United States by billing the government for freight shipments at higher air rates and generally higher air fuel surcharge rates even though the shipments were actually delivered by ground. Defendants have submitted false claims to the government for reimbursement of transportation costs that they knew were not reasonable nor permissible under the Contract or governing regulations. Defendants obtained cost savings by using ground trucking instead of air transportation and these savings benefitted Estes, Menlo's subcontractor, but not the government. The substantial profits earned by Estes at the government's expense rendered a core objective of the DTCI contract - reduced transportation costs for the government - unrealized. Instead, the government was billed for, and paid for, unreasonable and unallowable costs under the Contract.

### B. Failing to Provide Required Services For the Benefit of the Government

34. Menlo was awarded the DTCI contract in August 2007. Under the Contract, Menlo was responsible for managing DOD freight shipments in the continental United States with the goal of maximizing efficiencies and reducing shipment costs for the government. DOD regulations require Menlo "to select the most efficient transportation mode to meet the government's requirements." *Defense Transportation Regulation 4500.9-R, Part II, Chapter 213, § B.1.c.*(1) (effective July 2008). As Menlo knows, "[i]n many cases, surface transportation can be used to meet the delivery requirement at a much-reduced cost to the Government." *Id.* As such, under the Contract, the government may only be billed for a "reasonable" cost, which means a cost that "in its nature and amount ... does not exceed that which would be incurred by a prudent person in the conduct of competitive business" and would be incurred through "[g]enerally accepted sound business practices, [including] arm's-length bargaining." *Contract*, § H-10(e). Menlo has knowingly failed to meet its contractual obligations to the United States by billing the government for air transportation rates, and air fuel surcharge rates, when the freight could have been shipped, and was shipped, by ground transportation. The Contract provides that Menlo will receive between $13,241,688 and $14,899,680 each year for its transportation coordination services. In total, for work from August 2007 through August 2013, Menlo is scheduled to receive in excess of $83,000,000 for its shipment coordination work.

*Contract*, at 2, 5, 8, 11, 14, 17, 21. In addition, under the Contract, Menlo is entitled to a potential Award Fee totaling over $9,000,000.

### C. The Scheme

35. Under the Contract, the government generally submits a request to Menlo for a shipment pick up on a certain date and for delivery by a certain date, the latter called the "Mandatory Delivery Date ("MDD")." If the shipment involves freight which exceeds certain standard dimensional requirements, the delivery date is extended. Menlo then submits the shipment request to Estes, its subcontractor, and notifies the government of the estimated shipment charge using a rate for air delivery. If Estes accepts the request, Estes replies to Menlo that it will accept the shipment and then contacts a shipper to deliver the freight.

36. Often, if the pick up date is late in the week, typically a Thursday, Friday, or a weekend, Estes knows that it can deliver the shipment by ground at a lower cost and still make the MDD. Estes therefore instructs its selected carrier to ship the material by ground. However, Estes submits its invoice to Menlo using a rate for air. As a result, Menlo pays Estes and bills the government for an amount that was computed using an air rate, with an air fuel surcharge rate, even though both Menlo and Estes know that the lower applicable ground rate and ground fuel surcharge rate should be used.

### D. Examples of False Claims

37. For example, for Bill of Lading ("BoL") 12C69DJC, the government requested pick up at the San Joaquin Distribution Center ("SJDC") on Thursday, October 25, 2012, for delivery to Corpus Christi, Texas, by October 30, 2012. Menlo billed the government and paid Estes $541.22, but Estes paid only $163.53 to a separate carrier to ship the freight by ground.

38. For BoL 12C69GJC, the government requested pick up at SJDC on October 25, 2012, for delivery to Anniston, Alabama, by October 30, 2012. Menlo billed the government and paid Estes $877.63, but Estes paid only $354.81 to ship the freight by ground.

39. For BoL 12C6A1JC, the government requested pick up at SJDC on October 25, 2012, for delivery to Fort Stewart, Georgia, by October 30, 2012. Menlo billed the government and paid Estes $2,308.93, but Estes paid only $864.14 to ship the freight by ground.

Complaint filed under seal                                    10

40. Three additional examples involve shipments with pick up at the SJDC on Sunday, November 11, 2012, when the transportation was performed by FedEx. For BoL 12C99QJC, the government requested pick up at SJDC on November 11, 2012, for delivery to Holloman AFB, New Mexico, by November 15, 2012. Menlo billed the government and paid Estes $1,342.77, but Estes only paid FedEx $636.56 to deliver the shipment by ground.

41. For BoL 12C99RJC, the government requested pick up at SJDC on November 11, 2012, with delivery to Altus AFB, Oklahoma, by November 15, 2012. Menlo billed the government $746.17, but Estes only paid FedEx $280.29 to deliver the shipment by ground.

42. For BoL 12C99XJC, the government requested pick up on November 11, 2012, with delivery to Gulfport, Mississippi, by November 16, 2012. Menlo billed the government $1,291.72, but Estes only paid FedEx $572.82 to deliver the shipment by ground.

43. Other examples show false claims for shipments from various military depots across the United States, all of which were billed using air rates when the shipments were actually transported by ground. For example, for BoL 12A2ADBC, the government requested pick up from the Los Angeles, California depot DDBC, on Thursday, May 17, 2012, for next day delivery to Groton, Connecticut. For this over-dimensional shipment, for which additional time for delivery was allowed, Menlo billed the government $10,148.31, but Estes paid only $1,701.13 to deliver the shipment by ground.

44. For BoL 12A11TBC, the government requested a pick up from DDBC on Wednesday, March 14, 2012, for next day delivery to Philadelphia, Pennsylvania. For this over-dimensional shipment, for which additional time for delivery was allowed, Menlo billed the government $4,217.40, but Estes paid only $599.70 to deliver the shipment by ground.

45. For BoL 11A1PPJF, the government requested a pick up from DDBC on Friday, April 8, 2011, for a 3 day delivery to Jacksonville, Florida. Menlo billed the government $903.81, but Estes paid only $468.08 to deliver the shipment by ground.

46. False billings were also submitted, for example, on shipments from Hill Air Force Base ("Hill AFB"), in Utah. For BoL 21679802, the government requested a pick up from Hill AFB on Thursday, February 18, 2010, for a 2 day delivery to Atlanta, Georgia. Menlo billed the

Complaint filed under seal                    11

government $513.83, but Estes paid only $252.50 to deliver the shipment by ground.

47. For BoL 11AC4QHV, the government requested a pick up from Hill AFB on Thursday, November 3, 2011, for a 3 day delivery to Philadelphia, Pennsylvania. Menlo billed the government $525.13, but Estes paid only $208.08 to deliver the shipment by ground.

48. For BoL 11AC3GHV, the government requested a pick up from Hill AFB on Thursday, November 3, 2011, for a 3 day delivery to Pittsburgh, Pennsylvania. Menlo billed the government $309.04, but Estes paid only $92.49 to deliver the shipment by ground.

49. Additional false billings were submitted, for example, on shipments from New Cumberland, Pennsylvania. For BoL 355289SP, the government requested a pick up from the New Cumberland depo on Thursday, October 14, 2010, for next day delivery to Sacramento, California. The destination site required an appointment for delivery, for which additional time for delivery was allowed. Menlo billed the government $1,988.19, but Estes paid only $694.23 to deliver the shipment by ground.

50. For BoL 12AYT1SP, the government requested a pick up from the New Cumberland depot on Wednesday, May 16, 2012, for a 2 day delivery to Dallas/Fort Worth, Texas. Menlo billed the government $913.02, but Estes paid only $169.04 to deliver the shipment by ground.

### E. Implementing The Scheme

51. In the first two years of the Contract, Menlo's subcontractors for freight transportation were generally single-mode providers of services. For example, when EXP, Relator Ricks' company, was one of Menlo's subcontractors, it provided only air freight forwarding, never ground transportation. In 2009, Menlo terminated many of its freight forwarders and direct carriers as subcontractors, and replaced them with Estes, a freight forwarder that would provide both air and ground transportation services for Menlo.

52. Before contracting with Menlo, Estes' air rates were higher than Menlo's contracted NTE air rates with the government. In contracting with Menlo, Estes agreed to lower its air rates below the NTE air rates in Menlo's government contract, and to raise Estes' ground rates. Estes negotiated these new rates with Menlo in conjunction with convincing Menlo that, by using Estes, Menlo would incur much lower costs for coordinating and managing the freight

transportation services, since Menlo would only need to coordinate with one freight forwarder (Estes) instead of a multitude of other forwarders and carriers. This arrangement benefits Menlo significantly, because Menlo is paid for management services at a fixed price, which had already been negotiated and set. Moreover, it is possible that, as part of the arrangement between Estes and Menlo, Estes has and is providing Menlo with reduced rates and cost savings for work performed in their non-government contracts.

53. A subcontractor for transportation services, like Estes, may have a right to change the mode of transportation in a time-definite delivery:

> Shipments tendered to carriers for air service must move, all or in part, via air transportation unless extreme conditions (e.g., severe weather, strikes, etc.) warrant diversion to motor service. ***Notwithstanding the forgoing, shipments tendered to carriers for air service and subject to a time definite delivery condition may move in any mode of conveyance that the carrier reasonably expects to ensure the time definite delivery.***

*Air Freight Traffic Rules Publication No. 5*, at 1-2. (emphasis added).

54. However, in order to comply with the Contract terms and applicable regulations applying to best-value and reasonableness of transportation costs, whenever the mode of transportation is changed from air to ground, the lower ground transportation rates must be applied. *Contract, Part I, Section G-7* (emphasis added) ("The contractor shall invoice for the actual cost of transportation, *taking into consideration any achieved optimization opportunities*, up to the transportation NTE rate established in the BoL, *or the revised transportation NTE rate if a mode change results.*"). Defendants did not notify the government of such mode changes or the lower rates that should apply. Furthermore, Contract terms require Menlo to complete a pre-audit of all carrier invoices. *Contract, Performance Work Statement, § 1.4.4.5.* Such carrier invoices must be audited accurately for several factors, including but not limited to, the "contractor's contracted rates." *Contract, Performance Work Statement, § 1.4.4.5.2.1.* Finally, FAR 52.203-13(b)(3)(i)(B) requires Menlo to "timely disclose in writing to the Inspector General, with a copy to the Contracting Office whenever, in connection with the award, performance, or closeout of the Contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has

committed . . . [a] violation of the civil False Claims Act." Defendants' false billings and violation of Contract provisions and applicable law has resulted in substantial losses to the government.

## Count I

### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B)

55. Relators repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

56. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

57. Through the acts described above, Defendants have knowingly presented or caused to be presented, false or fraudulent claims for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

58. Through the acts described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

59. The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

60. As a result of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

61. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B) as described herein.

## Count II

### False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

62. Relators repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

63. This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

64. Through the acts described above, Defendants and Doe Defendants, acting together in concert, conspired to defraud the United States within the meaning of 31 U.S.C. § 3729(a)(1)(C).

65. As a result, the United States, unaware of the fraudulent conduct of Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

66. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

67. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(C) as described herein.

## Count III

### False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

68. Relators repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

69. This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

70. Through the acts described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States within the meaning of 31 U.S.C. § 3729(a)(1)(G).

71. As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the Defendants, and the United States sustained costs and damages.

72. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

73. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(G) as described herein.

### PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment against the Defendants as follows:

1. That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 et seq.;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3. That Relators be awarded all costs of this action, including attorneys' fees, costs and expenses; and

4. That Relators recover such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: 3/18/13

By: /s/ Michael A. Hirst
Michael A. Hirst, Esq.
CA Bar No. 131034
HIRST LAW GROUP, P.C.
200 B. Street, Suite A
Davis, CA 95616
Telephone: 530-756-7700
Facsimile: 530-756-7707
michael.hirst@hirstlawgroup.com

Dated: 3/18/13

By: /s/ Michael A. Hirst for
Mark Allen Kleiman, Esq.
CA Bar No. 115919
LAW OFFICES OF MARK KLEIMAN
2907 Stanford Avenue

Venice, CA 90292
Telephone: 310-306-8094
Facsimile: 310-306-8491
mkleiman@quitam.org

Attorneys for *Qui Tam*
Plaintiff/Relators Richard Ricks
and John Doe

# PROOF OF SERVICE

I am employed in the County of Yolo, State of California. I am a citizen of the United States, over the age of eighteen (18) years, and not a party to the within action. My business address is 200 B Street, Suite A, Davis, California, 95616.

On March 19, 2013, I served the following document(s), described as,

**Complaint and Demand for Jury Trial**
**Initial Material Disclosure Memorandum**
**Supplemental Statement of Material Evidence and Information**

on each party as follows:

Honorable Eric H. Holder, Jr.
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Honorable Benjamin B. Wagner
United States Attorney
Eastern District of California
501 I Street, Suite 10-100
Sacramento, CA 95814

XX         (BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED)

I placed a true and correct copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, certified mail, and return receipt requested, for collection and mailing in one of the United States Post Office Boxes located in Davis, California.

Executed on this 19th day of March 2013, at Davis, California. I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Jerry Hurst