Michael A Hirst, Esq. CA Bar #131034
michael.hirst@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, CA 95616
Tel: (530) 756-7700
Fax: (530) 756-7707

Attorneys for Plaintiff-Relators
Richard Ricks and Marcelo Cuellar

FILED

Feb 09, 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. RICHARD RICKS AND MARCELO CUELLAR, <br><br>                Plaintiffs, <br><br>       v. <br><br> MENLO WORLDWIDE GOVERNMENT SERVICES, LLC; MENLO LOGISTICS, INC.; CON-WAY INC.; XPO LOGISTICS, INC.; ESTES FORWARDING WORLDWIDE LLC; ESTES EXPRESS LINES; and DOES 1 through 25, <br><br>                Defendants. | **CASE 2:13-CV-0539-KJM-AC** <br><br> **FIRST AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

Plaintiffs Richard Ricks ("Ricks") and Marcelo Cuellar ("Cuellar"), through their counsel Hirst Law Group, P.C., and on behalf of the United States of America, allege as follows:

## I.   NATURE OF THIS ACTION

1.   Beginning in 2007, Defendants Menlo Worldwide Government Services, LLC, Menlo Logistics, Inc., Con-way Inc., now acquired by XPO Logistics, Inc. (collectively "Menlo"), Estes Forwarding Worldwide LLC, Estes Express Lines (collectively "Estes"), and Menlo's other subcontractors ("Doe Subcontractors") (Menlo, Estes and Doe Subcontractors are collectively referred to as "Defendants"), have knowingly submitted, caused the submission of, and conspired to submit, false and fraudulent claims to the United States in their work under the Defense Transportation Coordination Initiative ("DTCI").

2.   Under the DTCI Contract ("Contract"), Defendants have defrauded the government by submitting false claims for inflated charges to which they are not entitled.  Among other conduct, Defendants have knowingly and substantially: (1) overcharged for the actual line haul costs of shipping military freight, claiming the freight was shipped by air when the freight was actually shipped by ground; (2) overcharged for higher accessorial surcharges in connection with freight shipments, including charging for higher air fuel surcharges instead of lower ground fuel surcharges when the freight was actually shipped by ground; and (3) overcharged for other accessorial surcharges in connection with shipments, including charging a higher amount for over-dimensional surcharges for air shipments when the freight was actually shipped by ground, and even when, on numerous occasions, the freight was ineligible for an oversize surcharge at all when shipped by ground.

3.   In addition, Defendants have also defrauded the government by: (4) overcharging for expedited shipments, through which other accessorial surcharges were wrongfully inflated; (5) overcharging for truckload shipments by rounding up in charging for mileage, instead of rounding to the closest mile, which includes rounding down when appropriate; (6) overcharging for higher fuel surcharge rates for diverted freight by selecting the highest rate in effect on either the pickup date or diversion date, whichever was higher, rather than applying only the fuel surcharge rate in effect on the pickup date; and (7) overcharging for less than truckload

shipments by using an inflated weight for such shipments.

4.   Moreover, Defendant Menlo has defrauded the government by knowingly failing to perform its contractual duties to audit, monitor, and coordinate freight shipments for the benefit of the government and to ensure that shipment charges are reasonable and appropriate.  Despite knowing that Estes and Doe Subcontractors have been overcharging the government under the DTCI, and despite allowing that conduct to continue, Menlo received and retained substantial payments, including bonus payments, to which it knew it was not entitled.

5.   The law and public policy encourage whistleblowers to report on, and help to stop, fraud perpetrated against the government.  Nonetheless, when Defendant Estes discovered that Relator Cuellar had provided information about Defendants' fraud to the United States, in violation of law and public policy, Estes wrongfully retaliated against Cuellar by immediately firing him.

6.   Defendants' knowing submission of false and fraudulent claims for payment, and wrongful retaliation against Cuellar for reporting the fraud, constitute violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA"or "Act").  As a result of their fraudulent conduct, Defendants have caused the United States to sustain a direct loss of funds and damage to its interests.

7.   The FCA was originally enacted at the request of President Lincoln during the Civil War, when the president believed that the Union Army was being defrauded by contractors.  The Act was substantially amended by Congress in 1986 and 2009 to enhance the government's ability to recover losses sustained as a result of fraud.  At those times, Congress determined that fraud against the government was pervasive and that the FCA, which Congress described as the primary tool for combating government fraud, was in need of reform.  Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecute fraud on the government's behalf.

8.   Among other things, the FCA prohibits: knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; knowingly making, using, or

causing to be made or used, a false record or statement material to a false or fraudulent claim; and conspiring to defraud the government. *31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), (a)(1)(C).* Additionally, it prohibits knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing, or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government. *31 U.S.C. §§ 3729(a)(1)(G).* Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the loss sustained by the United States. *31 U.S.C. § 3729(a); 64 Fed. Reg. 47099, 47103 (1999).* The FCA also prohibits retaliation against a person who provides information about the fraud to the government, and mandates that such a person be entitled to all relief necessary to make that person whole. *31 U.S.C. § 3730(h)(1).*

9. The statute allows any person having information about an FCA violation to bring an action on behalf of the government and to share in any recovery obtained. The Act requires that the complaint be filed under seal for a minimum of 60 days, without service on the Defendants during that time, to allow the government time to conduct its own investigation and to determine whether to join the suit.

10. Based on the FCA, qui tam plaintiffs Ricks and Cuellar (collectively "Relators" or "Plaintiffs") seek to recover all available damages, civil penalties, and other relief for the violations alleged herein, in every jurisdiction to which Defendants' misconduct has extended.

## II.     PARTIES

11. Relator Richard Ricks is a United States citizen who resides in California. He is the former President and Chief Executive Officer of EXP Logistics Solutions, Inc. ("EXP"). EXP was a subcontractor to Menlo for air shipments under the DTCI Contract during the period August 2008 to December 2009, when Menlo replaced EXP with Estes.

12. Relator Marcelo Cuellar, previously identified as "John Doe," is a United States citizen who currently resides in Washington. Cuellar worked for Estes from January 2010 until February 10, 2015, at the Defense Distribution Depot in Tracy, California, first as Operations Coordinator and later as Supervisor of Logistics. On February 10, 2015, after Estes' counsel

learned that Cuellar had provided information about the fraud to the United States, it immediately and wrongfully terminated Cuellar.

13. Defendant Menlo Worldwide Government Services, LLC, is a limited liability company established in Delaware, registered to do business in California as well as other states. Upon information and belief,  Menlo Worldwide Government Services, LLC, is a subsidiary of Menlo Logistics, Inc., which is itself a subsidiary of Con-way Inc., previously a public-traded company listed on the New York Stock Exchange.  Menlo Worldwide Government Services, LLC's principal office in California is located at 2855 Campus Drive, San Mateo, California.

14. Defendant Menlo Logistics, Inc., is a corporation established in Delaware and registered to do business in California as well as other states.  It is one of three operating units of Con-way Inc.  Menlo Logistics, Inc., operates under the assumed name of Menlo Worldwide Logistics.  The company's principal office in Delaware is listed as 2711 Centerville Road, Suite 400, Wilmington, Delaware.

15. Defendant Con-way Inc., is a Delaware corporation with headquarters located at 2211 Old Earhart Road, Suite 100, Ann Arbor, Michigan.  On October 30, 2015, Defendant XPO Logistics, Inc., announced that it had consummated an agreement to acquire Con-way Inc.

16. Defendant XPO Logistics, Inc., is a Delaware corporation with headquarters located at Five Greenwich Office Park, Greenwich, Connecticut.  Defendant Con-way Inc., is now a wholly-owned subsidiary of XPO Logistics, Inc., a public-traded company listed on the New York Stock Exchange.

17. Defendant Estes Forwarding Worldwide LLC, is a limited liability company established in Virginia on April 6, 2007.  Its principal office is located at 1100 Commerce Road, Richmond, Virginia.  Upon information and belief, it is a subsidiary of Estes Express Lines.

18. Defendant Estes Express Lines is a family owned and operated freight transportation provider incorporated in Richmond, Virginia.  Its principal office is located at 3901 West Broad Street, Richmond, Virginia.

19. The identities of the remaining Doe Defendants (Doe Subcontractors) who have knowingly submitted false and fraudulent claims to the government are presently unknown to

Relators.  All listed Defendants and such additional Doe Defendants served as contractors, agents, partners, and/or representatives of one and another in the fraud, concealment, and submission of false and fraudulent claims, as well as the wrongful retention of overpayments, and were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein.

## III.   JURISDICTION AND VENUE

20.  This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

21.  Under 31 U.S.C. § 3730(e), there has been no public disclosure of the allegations or transactions in this Complaint.  To the extent there has been any such disclosure, Relators Ricks and Cuellar constitute "original sources" pursuant to 31 U.S.C. § 3730(e)(4). Prior to any public disclosure, Ricks and Cuellar voluntarily disclosed to the government the information on which the allegations or transactions discussed herein are based; they have knowledge independent of, and that materially adds to, any publicly disclosed allegations or transactions; and this information was provided to the government before this action was filed.

22.  Personal jurisdiction and venue are proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a), as one or more of the Defendants or their agents can be found, reside, transact business, or otherwise engaged in fraudulent conduct within the district.

## IV.   BACKGROUND

### A.   Defense Transportation Coordination Initiative

23.  The Defense Transportation Coordination Initiative was a massive initiative by the United States Department of Defense ("DOD") to manage distribution of military freight in the continental United States.  *Defense Industry Daily, "DTCI: Changing Military Shipping in the USA - and Beyond" (August 26, 2007), at 1.*  The United States Transportation Command, Department of Defense, described the DTCI as:

[A] CONUS [Continental United States] freight initiative aimed at increasing

operational effectiveness and at the same time obtaining efficiencies.  The premise is that DoD will increase operational effectiveness ... [and] also includes obtaining efficiencies through best business practices such as increased consolidations and mode conversions.

*DOD Agency Report, DTCI Information Paper, May 3, 2004, at 1.*

### B.   Contract Awarded to Menlo Worldwide Government Services, LLC

24.   On August 17, 2007, a full year after receiving and reviewing bids from numerous entities, including Federal Express and UPS, the United States Transportation Command announced the awarding of the competitively bid DTCI Contract, HTC711-07-D-0032, to Menlo.  In winning the bid to be the government's Contractor (also called the DTCI "Coordinator"), Menlo undertook to manage all DOD freight movements in the continental United States under the DTCI with the goal of maximizing efficiencies and reducing costs. *Commercial Carrier Journal News, August 20, 2007.*  As described in the Defense Industry Daily, the premise "is for DoD to competitively award a long-term contract with a world class transportation coordinator ... [and] save up to 20%, as [the coordinator] manages, consolidates, and optimizes freight movements."  *DTCI: Changing Military Shipping in the USA - and Beyond, August 26, 2007.*

25.   The DTCI Contract is a Federal Acquisition Regulation ("FAR") Part 15, indefinite-delivery, requirements-type contract, which includes fixed-price, cost-reimbursement, award fee, and award term-option provisions.  *DTCI - Billing-Payment-Audit Plan, Version 1.0, November 30, 2007, at 4.*  The Contract was valued at $1.635 billion and consisted of a three-year base period, with four option years.  *Defense Industry Daily, DTCI: Changing Military Shipping in the USA - and Beyond, at 1.*

26.   In April 2015, after experiencing problems with Menlo and its subcontractors as described herein, the United States dropped the DTCI and Menlo as the transportation Coordinator, with a two-year phase out of the Contract currently in effect.

### V.   SUMMARY OF THE FRAUD

27.   After its selection as Coordinator to manage the shipment of military freight under the DTCI, Menlo contracted with Estes, as well as other subcontractors, to have the freight

First Amended Complaint Filed Under Seal                6

transported by various shipment "modes," including by "air" (in an airplane) and by "surface" or "ground" transportation (in a truck).  The Government agreed to pay Menlo hefty management services fees for its coordination work, and Menlo has received $131,708,257 as of December 2015 for such services.  But under the Contract and the DTCI federal regulations ("Regulations"), apart from those fees, the government is to pay only for the actual costs of the shipments themselves.  In its winning bid for the Contract, Menlo proposed, and the government accepted, maximum charges – called "Not To Exceed" ("NTE") rates under the Contract – which were the maximum charges that the government could be billed for each air shipment, and a lower maximum charge that the government could be billed for each truck shipment.  Menlo and Estes were both well aware of these maximums, of course.  In their own contracts with each other, Menlo and Estes negotiated and established set rates for specific air shipments and lower set rates for specific truck shipments to fit within the Government's contractually accepted maximum charges.  Under the DTCI Contract and Regulations, the actual, agreed upon shipment charges between Menlo and Estes are the actual charges that should be billed to the United States by Menlo for the shipment of freight by its subcontractor Estes.

28.  Whenever military freight under the DTCI needs to be shipped, base transportation officers electronically contact Menlo, supply information on the freight, and advise Menlo the date by which the shipment needs to arrive at its destination, called the "Mandatory Delivery Date" ("MDD").  Menlo then selects the mode of transportation (for example air, truckload, or less than truckload) for the shipment and issues a tender to a subcontractor, such as Estes.  The tender identifies the freight and the MDD, and offers the freight for shipment by a specific mode selected by Menlo in the tender.  The tender also lists the specific, prearranged and pre-negotiated price between Menlo and its subcontractor for that mode.

29.  For all freight shipped throughout the United States under the DTCI, the government only sends the shipment information to Menlo, the DTCI Coordinator.  The government does not receive or review any shipment information from Menlo's subcontractors, like Estes, who actually move the freight.  Estes submits its shipment claims to Menlo and Menlo submits claims for payment to the United States.  By not receiving the subcontractor cost information itself, the

Government was set up to be defrauded by Menlo and Estes.  Over many years, Defendants have regularly charged the government for shipments by air and related accessorial charges at the highest shipment rates, when the freight was actually delivered by truck and entitled only to lower payments.

30.  The DTCI Contract and Regulations are abundantly clear: unlike some commercial contracts, payments for shipment of freight under the DTCI depend on the mode (i.e., air, truck, less than truckload) by which the freight is transported.  Each mode has numerous different NTEs that are mode specific.  Defendants' false charges for air shipments always exceeded the actual charges in their contracts for ground deliveries and even exceeded the maximum NTE charges allowed by the Government for ground shipments.

31.  Menlo and Estes have defrauded the government by knowingly submitting false invoices for inflated air mode shipment charges when the freight was actually shipped by ground, generally by the less than truckload ("LTL") mode, which was eligible only for a much lower charge to the Government than shipment of freight by air.  Moreover, in addition to falsely submitting claims about the mode of shipment, Defendants have knowingly inflated the charges to the Government for various accessorial surcharges, including charges for shipment of oversized freight and for fuel surcharges -- both of which charges differ significantly under the DTCI based on whether the freight was shipped by air or ground.

## VI.   PRE-BID SOLICITATION INFORMATION ABOUT THE CONTRACT

32.  Menlo understood before it ever bid on the Contract that charges to the government under the DTCI program were based on the mode of shipment used to transport the freight.  The DTCI Contract and Regulations make clear that the mode used to ship freight controls the charges that can be submitted to the Government.

For example, Section G-7 of the DTCI contract provides:

The authorized ordering officer [transportation officer at each base] will submit requests for transportation to the contractor [eventually Menlo] electronically (see Part I, Section C, PWS, Table 6).  The contractor will respond to the request for shipment electronically.  The response will include the estimated shipment charge, comprised of the appropriate transportation not-to-exceed (NTE) rate established at contract award *by mode*/route (Attachment 1), and any required accessorial charges (Attachment 2 and Appendix B of the PWS).

First Amended Complaint Filed Under Seal          8

*Contract, § G-7 (*emphasis added to "by mode.")  As reflected in the provision above:  the Government transportation officer identifies the freight to be shipped (by sending a form 219); Menlo reviews the shipping information and issues the estimated shipping charge for no more than the NTE maximum for the specific mode of shipment Menlo selects, plus any associated accessorial surcharges for that mode (by sending a form 220); and Menlo then issues a tender to its selected subcontractor to ship the freight for the pre-negotiated payment amount between Menlo and the subcontractor established for that mode of shipment, plus the accessorial surcharges.  The G-7 Contract provision continues in the next sentence:

> The contractor will submit a NTE rate for anticipated carrier freight costs based on the shipment offering without assumption of risk for subsequent optimization opportunities.

*Id.*

33.  The above provision highlights the Government's interest in "optimization" opportunities -- obtaining whatever savings can be realized by finding a cheaper mode of shipment.  The Contract does not force Menlo to find a cheaper mode if one is not available.  Thus, Menlo does not need to submit an NTE rate that represents a lower cost mode (for example, LTL) if that mode cannot be used to meet the MDD.  In other words, Menlo does not have to "assum[e] the risk for subsequent optimization opportunities."  It may select the mode it thinks is necessary to meet the MDD.  If a subsequent optimization opportunity can be found, then additional savings will be realized by the Government; if not, the freight will be shipped pursuant to the original offering, Menlo will bill the Government for the actual costs of shipment for that mode plus any accessorial surcharges for that mode, and Menlo will pay its subcontractor that amount.

34.  Before it even bid on the Contract, and long before it was selected as the Coordinator, Menlo understood all of this.  The Questions from bidders and Answers from the Government following the original Solicitation, HTC711-060R-001, became formally incorporated into the Solicitation as Amendment 0001.  The amendment included questions from Menlo and other bidders, and answers from the DOD, before any bids to become the DTCI

Coordinator were received.  Question 10 of the Questions and Answer makes the meaning of Section G-7 abundantly clear:

> 10.  Reference Section G-7.  What does "without assumption of risk for subsequent optimization opportunities" mean?
>
> [Answer:]  The NTE rate submitted is based on the initial offering and should not take into consideration "possible" consolidation or mode changes after pick-up. This mitigates the risk to the contractor as the initial offering assumes a less-than-optimal mode, e.g., LTL rate vice TL rate.  *The actual invoice will then reflect the actual rate from optimization and mode conversion.*

*HTC711-060R-001, Amendment 001, Question 10* (emphasis added).  As with the other DTCI Contract provisions and Regulations discussed below, the Government's answer to this question cannot be understood to suggest anything other than that the mode of shipment matters, and that the Government's contractor (Menlo) must "submit an invoice that reflects the actual rate from optimization [following] a mode conversion."  Similarly, in Question 33, another bidder asked what would happen to payment for a shipment when "a contractor initiates a mode change (ex: as a result of optimization)."  The Government explained that when the mode of shipment is changed:

> **The Contractor will invoice for the actual costs paid based on the mode of transportation actually used.**

*HTC711-060R-001, Amendment 001, Question 33* (emphasis added).

36.  Before ever bidding on the Contract, Menlo understood, and before ever beginning work on the Contract, Estes understood, that under the DTCI, the Government is supposed to benefit from lower charges whenever a shipment can be "optimized" -- can be shifted to a lower cost mode.  Similarly, under the DTCI Contract, the Government will (and does) also pay the higher charges when a more expensive mode shift becomes necessary.  Instead, in thousands of instances, Menlo and Estes shifted to a lower cost mode but nonetheless knowingly submitted a claim to the government for the higher charge.

## VII.   CONTRACT PROVISIONS RELATING TO TRANSPORTATION SERVICES

36.  Menlo's transportation coordination services include determining the appropriate mode based on the freight characteristics, equipment type, and the mandatory delivery date. *Contract HTC711-07-D-0032, at 29*.  As discussed above, under the DTCI, freight can be moved

through a variety of modes, including by air, motor, rail, and water.  Motor transportation may be by a complete truck load ("TL") or by less than a truckload ("LTL").  Material shipped by LTL is typically combined with other LTL shipments.  For TL shipments, mileage is a component in determining the appropriate basic shipment charge, or "line haul" amount; under the Contract, mileage is determined by the Defense Table of Official Distances in effect on the date of shipment pick-up.  For LTL shipments, mileage is not a factor; instead, the weight of the item is a component in determining the appropriate line haul charge.  *Contract HTC711-07-D-0032, at 95.*

37.  In addition to the line haul charge, a separate accessorial fuel surcharge may be billed to the government for air and ground shipments, and these surcharge rates, calculated separately for air and ground transportation, regularly change based upon the price of fuel.  In addition, the Contract provides that the government may be charged for an accessorial over-dimensional ("oversized") surcharge when a shipped item exceeds certain dimensions.  These dimensions differ for ground and air shipments.  The amount of the oversize surcharge for ground delivery is calculated per mile based upon the freight's length, width, and height and is subject to a minimum charge of $125.  For air delivery, the oversize surcharge is 30% of the base line haul amount.  *Schedule of Accessorial Charges, Accessorial Rate Table, at 5.*

38.  Additional accessorial charges apply to expedited shipments.  Expedited shipments include those that require delivery the same day or next day before a normal delivery cycle.  *Contract, Performance Work Statement, Part 1, Section C, § 1.4.5.17.*

39.  The costs for transportation services are provisionally paid and subject to post-payment Contract audit for allowable cost determination in accordance with the Contract provisions.  *DTCI Billing-Payment-Audit Plan, November 30, 2007, at 4 through 13.*

40.  Contract Line Item Number ("CLIN") 2 pertains to shipment costs.  The Contract specifies that payment for these costs will be based upon actual costs, up to the maximum NTE rates that were negotiated between the government and Menlo prior to contract award.  *Contract HTC711-07-D-0032, at 3.*

41.  Contract provisions also provide that Menlo is responsible for accounting for the

reasonableness and validity of its subcontractor's claimed costs for shipments and the charges it

submits to the government:

> Auditing
>
> (1) The contractor is responsible for accounting for costs consistently and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are reasonable, allocable to the contract, and comply with the statements in the applicable special provisions herein.

*Contract, Part I, Section H-10(h).*

42.  Thus, the Contract specifies how the contractor will submit invoices for actual costs

when the mode of transportation changes:

> The contractor shall invoice for the actual cost of transportation, taking into consideration any achieved optimization opportunities, up to the transportation NTE rate established in the BoL, *or the revised* transportation NTE rate if a mode change results.

*Contract, Part I, Section G-7* (emphasis added).

## VIII.  DTCI REGULATIONS

### A.  Transportation Regulations

43.  The Defense Transportation Regulation 4500.9-R, Part II, Cargo Movement, Chapter

213, prescribes responsibilities and procedures involving shipments under the DTCI Contract.

The regulations set forth several operating provisions applicable to Menlo's work and billing

under the Contract, including the following:

> Mode determination based on stated shipper requirements and the Mandatory Delivery Date (MDD).
>
> (1)  DTCI's PWS [Performance Work Statement] directs the Coordinator to select the mode based on the MDD, therefore, the shipper [government personnel] will no longer identify a transportation mode (truck, rail, and air) prior to offering the shipment for movement.  DTCI is considered a Mode Neutral Program since the shipper only determines when the freight must arrive at its next destination using only a MDD.  Based on the MDD and other requirements (e.g., accessorial) submitted by the shipper through the shipper system, *the Coordinator will select* the most efficient transportation mode to meet the shipper's requirement.  In the event the shipment must be delivered the same day or next day, expedited service will be used.  Expedited service does not always mean the shipment must travel by air. *In many cases, surface transportation can be used to meet the delivery requirement at a much-reduced cost to the Government.*

*Defense Transportation Regulation 4500.9-R, Part II, Chapter 213, § B.1.c.(1) (effective July*

*2008)* (emphasis added).

44. Additional regulations specify that the Coordinator will notify the government shipper as to the actual carrier of the shipment:

> The DTCI Coordinator may employ multi-brokering of freight to achieve required efficiencies of the program. The Coordinator is responsible for notifying the shipping activity concerning carriers load schedules (e.g., which carrier gets loaded). This is accomplished using EDI [Electronic Data Interchange] 220 DTCI Transportation Service Responses from the Coordinator. The 220 returned to the shipper will show the actual carrier's SCAC [Standard Carrier Alpha Code] and any equipment identifiers.

*Defense Transportation Regulation 4500.9-R, Part II, Chapter 213, § E.3.b.(1).*

45. The regulations also contain certain billing and payment requirements, namely that shipment costs are provisionally paid and subject to audit for allowability:

> Due to the unique nature of the DTCI shipment rating process and related FAR based cost reimbursement provisions incorporated into the DTCI contract, *the CO [government's Contracting Officer] will not have the capability to validate actual line-haul shipment costs. These costs will be provisionally paid (i.e., contingent liabilities) and subject to post-payment contract audit for allowable cost determination.*

*Defense Transportation Regulation 4500.9-R, Part II, Chapter 213, § E.8.c* (emphasis added).

## B. Federal Acquisition Regulations

46. The FAR sets forth rules that govern the United States' purchases of goods and services. The guiding principle of the FAR is to deliver the "best value" product or service to the United States while maintaining the public's trust and fulfillment in public policy objectives. *FAR 1.102(a).* Under the FAR, all participants must exercise "sound business judgment in providing the best value product or service to meet the customer's needs." *FAR 1.102-1(d).* "Best value" is defined as "the expected outcome of an acquisition that, in the government's estimation, provides the greatest overall benefit in response to the requirement." *FAR 2.101.*

## IX. CERTIFICATIONS

47. Menlo is required to submit a Standard Form 1034, Public Voucher, containing the monthly Summary Invoice detail for DTCI shipment transactions for each applicable shipper location. *Contract, Part I, Contract Administration Data, Section G-7.* This form's certification states that:

"Pursuant to authority vested in me, I certify that this voucher is correct and proper for payment."

## X.   ALLEGATIONS

48.   Relators incorporate by reference and reallege as though fully set forth herein all preceding paragraphs.

### A.   False Billings for Air Shipments When the Freight is Shipped by Ground

49.   Since 2007 and continuing through their work under the DTCI, Defendants Menlo, Estes, and Doe Defendants have knowingly submitted, caused the submission of, and conspired to submit false and fraudulent claims to the United States by falsely overcharging the government for higher air shipment charges when the freight was actually delivered by ground, including higher air fuel surcharges and higher air oversized surcharges, even on occasions when the freight delivered by ground did not qualify at all for an oversize surcharge.  Defendants have submitted or caused the submission of false claims to the government for transportation costs that they knew were fraudulent, not reasonable, and not permitted under the Contract or Regulations.  Defendants obtained cost savings by using ground shipments instead of air shipments and applied those savings to benefit Defendants, at the expense of the  government. The substantial profits earned by Defendants at the government's expense conflicted with a core objective of the DTCI Contract -- reduced transportation costs for the United States.  Instead, the government was falsely billed for, and paid for, fraudulently inflated charges under the Contract.

### 1.   False Line Haul Charges

50.   As discussed above, the Contract establishes thousands of routes for shipments by both air and truck transportation.  The routes are called "line hauls" and the Contract contains the maximum NTE amounts, set forth separately by mode, that the Government may be charged for each line haul shipment.  However, the Contract is clear that, regardless of the NTEs for each mode, the government may be charged only for the actual costs incurred for each line haul. Those actual costs are the contract rates that Menlo and Estes agreed to for each line haul, by mode, for shipment of military freight under the DTCI contract.  Estes' contractual rates with Menlo include the profits that Estes negotiated for each line haul, for each mode.  Menlo is not

permitted by the Contract to obtain any profit from the shipments.  The government is to be charged the actual costs of shipment, which must be below or equal to the NTE maximum for the selected mode and line haul.

51.  On thousands of occasions, Menlo has tendered a shipment to Estes for air delivery, but Menlo and Estes both knew that Estes changed the initial mode and shipped the freight by truck.  Defendants have knowingly submitted false claims for higher air line haul charges instead of the actual, lower costs for ground line haul shipments.  The air line haul billings are more than the actual costs of the ground shipments and even more than the maximum NTE rates the government agreed to accept for shipments by ground.

52.  Menlo knows that a change in the delivery mode will, and did, affect the cost to the government.  In a January 12, 2012 email (emphasis added), the government's Anna Gensler, HQDLA Transportation Policy, states to Bradley Goertzen at Menlo and numerous others:

> Menlo is doing the right thing *by actively mode shifting* or evaluating each load against LTL and TL rates independent of how the mode is passed to them and making the routing *based on which mode provides the cheapest cost for the service required.*

53.  In another email (emphasis added), Menlo is praised for changing the mode of delivery to achieve a cost savings for the Government:

> On 1 Apr, DTCI's 2nd day of operations at DDPW (Puget Sound) …  DLA's legacy shipper system (DSS) recommended a typical Less Than Truckload (LTL) surface shipment.  DTCI's contracted rate for LTL would have been $125.20 with Yellow Freight.  However, Menlo's load planners identified a "deferred air" rate with Panther Express for $93.60 that still met the Mandatory Delivery Date (MDD) of 9 Apr.  ***Even though counterintuitive (air freight is almost always thought to be the more expensive option), Menlo's effort here saved the government $31.60.***  Although this is a relatively small savings on only one effort, at full implementation (over 40,000 shipments per month), these types of savings add up to huge numbers in the aggregate!

Defendants knew that a change in mode could save costs for the Government, and understood that the Government would pay only the actual costs based on the shipment mode.  As made clear from the outset, in the solicitation materials: "***The Contractor will invoice for the actual costs paid based on the mode of transportation actually used***."  *HTC711-060R-001, Amendment 001, Question 33* (emphasis added).

First Amended Complaint Filed Under Seal                    15

**2. False Air Fuel Surcharges**

54. The Accessorial Rate Table, dated March 2008, is contained in Attachment 1, Section J, of the DTCI Contract. The fuel surcharge (Code "405"), shown at the top of page 1, varies depending on the price of fuel. For ground transportation, the Military Surface Deployment and Distribution Command ("SDDC") publishes the fuel surcharge policy and the fuel-related adjustment amounts for various time periods. For air transportation, the United States Transportation Command ("USTRANSCOM") publishes the fuel surcharge policy and adjustment amounts.

55. The fuel surcharge accessorial is an additional charge to the government that is applied to the specific mode of shipment. The fuel surcharge rates are determined each week or month, differ for air and ground shipments, and typically range between 6 and 39 percent of the line haul amount. Generally the air fuel surcharge rate is higher than the ground fuel surcharge rate. Thus, for a ground delivery, a *ground* fuel surcharge rate (of 20 percent, for example) would be applied under the Contract to the applicable ground line haul amount and an additional 20 percent of the ground line haul amount could be charged to the government for the ground fuel surcharge. For an air shipment, the air fuel surcharge rate (of 25 percent, for example) would be applied to the air line haul amount and an additional 25 percent of the air line haul amount could be charged to the government for the air fuel surcharge.

56. For thousands of shipments, Defendants have charged the government for an accessorial *air* fuel surcharge for shipments of freight by *truck*. For a majority of such shipments, the air fuel surcharge rate was higher than the ground fuel surcharge rate. Moreover, the air fuel surcharge rate has been applied to the much higher air line haul amount. Instead, the lower ground fuel surcharge rate should have been charged to the lower ground line haul amount. In engaging in such conduct, Defendants have knowingly submitted false and fraudulent claims for accessorial fuel surcharges.

57. For example, on one occasion, government Contracting Officer Belfield Collymore ("Collymore") became aware that Menlo had billed for an air fuel surcharge when the freight was shipped by ground. Collymore told Michael Nadolski ("Nadolski"), Menlo's Director of

Contracts, that Menlo must bill for the actual mode utilized, and that Menlo should refund the difference. Nadolski agreed and told Collymore that he would ask Brad Goertzen at Menlo to start identifying shipments where this may have occurred for purposes of repaying the government. Nonetheless, Menlo failed to take any action to identify such shipments and never repaid the government.

58. Thereafter, in a June 1, 2012, email from Nadolski to Cindy Chmiel at Menlo, Nadolski further confirmed his understanding that an air fuel surcharge should not apply when the freight has been shipped by ground:

> To the extent we know how the carrier actually moved the freight the correct FSC [fuel surcharge] rate should apply. However, many times we don't know so we are at the mercy of the carrier. However, once the Gov brings it [to] our attention we are required to make the adjustment.

To date, no such adjustment or repayment has been made by Menlo.

**3. False Air Oversized Surcharges**

59. The Contract provides for an accessorial surcharge when a shipped item exceeds certain dimensions. *Contract, G-7.* The provisions addressing oversized freight, contained in the Contract's Appendix B, define oversized freight by mode.

60. A comparison of the Contract's oversized payment authorization readily shows that for air shipments, freight is deemed to be oversized and entitled to the oversized surcharge payment when the item exceeds much smaller dimensions than would be required for ground shipments.

|  | Ground Oversize | Air Oversize |
|---|---|---|
| Length | 576 inches (48 feet) | 125 inches |
| Width | 102 inches (8 feet 6 inches) | 88 inches |
| Height | 162 inches (13 feet 6 inches) | 59 inches |
| Length Plus Girth |  | 300 inches |

61. The Contract further provides, by mode, the applicable accessorial surcharge for oversized freight (Code "520"). *Contract's Accessorial Rate Table, Attachment 1, Section J.* The oversize surcharge amounts for ground shipment ("Motor") are shown on pages 3 and 4 of this table; the oversize surcharge amount for "Air" shipments is shown on page 5. While the

ground oversize surcharge payments vary by different sizes, with a $125 minimum payment, the air oversize surcharge payment is always 30 % of the air line haul amount.  Similarly, Menlo's contract with Estes also sets forth the oversize information by mode.  For ground shipments, the oversized surcharge payment is calculated per mile based upon the freight's length, width, and height and is subject to a minimum payment of $125.  For air shipments, the oversized surcharge payment is 30% of the line haul cost.

62.  The Contract determines what constitutes "oversized" by separate measurements for air and ground modes.  It then provides for a separate accessorial payment based on the specific mode used to ship the oversized freight.  Defendants have knowingly defrauded the government with regard to oversized surcharges, as well as line haul charges and fuel surcharges, by billing for air oversized surcharges when the freight was delivered by ground and not entitled to the air oversize surcharge payment.

63.  Numerous examples exist of Defendants' billing the government for air oversized surcharges when there was no basis to do so.  For example, in Bill of Lading 12A2ADBC,  Estes shipped freight by *ground* from Barstow, California to Groton, Connecticut with pickup on May 17, 2012, and delivery on May 21, 2012.  The item measured 48 inches in length, 52 inches in width, and 74 inches in height.  Although none of those dimensions qualify for an oversized surcharge in a *ground* shipment, Menlo and Estes nonetheless billed the Government $1,890.99 for an *air* oversize surcharge, apparently because the height exceeded 59 inches for an air shipment.  (The surcharge was computed at 30% of the base line haul amount of $6,303.30, with 30% as the oversize surcharge for an air shipment.)

64.  No justification exists to charge the Government under the DTCI Contract for an air oversized surcharge for regular-sized freight delivered by ground.  The Contract expressly specifies, by mode, the specific measurements that qualify for an oversized surcharge, with different measurements for air and ground modes, and different payments for those modes.

**B.   Other Fraudulent Claims Submitted to the Government**

**1.   False Claims for Expedited Shipments**

65.  Defendants have also knowingly submitted, caused the submission of, and conspired

First Amended Complaint Filed Under Seal              18

to submit false and fraudulent claims by inflating accessorial surcharges charged to the government for "expedited" shipments.

66.  In July 2008, the government added a provision allowing accessorial surcharges for the expedited delivery of freight, including shipments that require delivery the same day or next day before a normal delivery cycle. *Contract, Performance Work Statement, Part 1, Section C, § 1.4.5.17.*  For expedited air shipments, the accessorial rate, called the "EXP accessorial" was 150% of the air line haul amount.   For ground shipments, the EXP accessorial surcharge was 20% of the ground line haul amount.  However, instead of applying the EXP accessorial rates only to the air or ground line haul amounts, Defendants applied the EXP accessorial rates to the line haul amounts <u>and</u> to the other accessorials involved in the shipment.  For example, if the government requested an expedited shipment of oversized freight with an air line haul amount of $500, Defendants appropriately increased the air line haul amount by 150% to $1,250; however, they then inappropriately also applied the air fuel surcharge amount (assume 24%) to the larger, increased line haul amount of $1,250, for an additional $300; and they then also inappropriately applied the oversized  surcharge rate of 30% to the $1,250, as well, for another $375.  Thus, in this example, the total charges to the government for the expedited shipment would be $1,925 ($1,250 + $300 + $375 = $1,925).  However, the EXP accessorial rate of 150% should have been applied to the $500 air line haul amount *only*, resulting in an additional charge of $750 for the EXP accessorial, for a total of $1,250 for the line haul shipment.  The 24% air fuel surcharge and the 30% air oversized surcharge should have been applied to the $500 original line haul amount only, resulting in correct charges of $120 and $150, respectively.  Thus, the correct total charge for the shipment should have been $1,520 ($1,250 + $120 + $150 = $1,520) , not the falsely inflated $1,925 charge.

### 2.  False Claims for Rounding Up Mileage

67.  Defendants have also knowingly submitted, caused the submission of, and conspired to submit false and fraudulent claims by rounding up mileage for freight moved by TL.  For TL shipments, mileage is a component in determining the appropriate ground line haul amount.  The contract requires that the mileage be based upon the Defense Table of Official Distances

("DTOD") in effect on the date of shipment pick-up.  Such distances are to be rounded to the nearest mile.  *www.defensetravel.dod.mil/site/faqdtod.cfm.*  Instead, Defendants have routinely rounded up to the next higher mile.  For example, if the DTOD listed mileage as 615.1 miles, Defendants have *rounded up* the mileage to 616 miles.  There was no effort to round *down* to the actual, closest mile, because rounding down would not have maximized the payments to Defendants.  Such fraudulent maximization of payments was inappropriate and done at the expense of the government.

### 3.   False Claims for Using Higher Fuel Surcharge Rates for Diverted Shipments

68.  Defendants have also knowingly submitted, caused the submission of, and conspired to submit false and fraudulent claims by using a higher fuel surcharge rate that was applicable on the day that the government directed that the shipment be diverted, or re-consigned, to another location.  Defendants should have applied the fuel surcharge rate in effect on the original pick-up date for the freight.  The correct fuel surcharge rate, the rate on the day of pick-up, was used by Defendants only if it was *higher* than the rate on the day of the diversion request.  Again, Defendants' intent was to maximize their payments from the government, even though such fraudulent  maximization of payments was inappropriate and done at the government's expense.

### 4.   False Billings for Increasing the Weights of Shipments

69.  Defendants have also knowingly submitted, caused the submission of, and conspired to submit false and fraudulent claims by increasing the weights of LTL shipments.  The government initially weighs the freight before shipment.  However, in numerous instances, Estes has re-weighed the freight and increased the billed amount to the government based on an falsely inflated weight, resulting in a higher charge to the government.

### C.   Failing to Provide Required Services for the Benefit of the Government

70.  As stated above, the government selected Menlo as the DTCI Coordinator in August 2007.  Under the Contract, Menlo was responsible for managing DOD freight shipments with the goal of maximizing efficiencies and reducing shipment costs for the United States.  DOD regulations require Menlo "to select the most efficient transportation mode to meet the government's requirements."  *Defense Transportation Regulation 4500.9-R, Part II, Chapter*

*213, § B.1.c.(1)*.  As Menlo knows, "[i]n many cases, surface transportation [rather than air shipments] can be used to meet the delivery requirement at a much-reduced cost to the Government." *Id.*  Under the Contract, the government may only be billed for the actual costs of shipment, based on the actual mode used to transport the freight.  *See, e.g., Contract, Part I, Section G-7*.  Menlo has knowingly failed to meet its contractual obligations to the United States by, among other things, billing the government for air shipment line haul amounts, air fuel surcharges, and other air accessorial surcharges, when the freight could have been shipped, and indeed was shipped, by ground transportation.  The Contract provides that Menlo will receive between $13,241,688 and $14,899,680 each year for its transportation coordination services.  In total, for work from August 2007 through December 2015, Menlo received in excess of $131 million for its shipment coordination work.  *Contract, at 2, 5, 8, 11, 14, 17, 21*.  In addition, under the Contract, Menlo is entitled to a potential, discretionary Award Fee, and has received $10,973,005 for such payments through December 2015.  All of these payments to Menlo would not have been made if the government had known of its fraud, and Menlo has retained such payments despite knowing that it is not entitled to them.

### D.  Opportunity to Engage in the Fraud

71.  Under the Contract, the MDD is extended for shipments over the weekend and for oversized freight.  *Defense Transportation Regulation, Part II, Chapter 213, § B.1.d.(2)*.  As such, if the pick up date is late in the week, typically a Thursday, Friday, or a weekend, Estes and Menlo know that the freight can be delivered by ground at a lower cost and still make the MDD.  Estes therefore instructs its selected carrier to ship the freight by ground, typically by LTL.  However, instead of passing along to the United States the savings from optimizing the freight for ground delivery, Estes submits its invoice to Menlo using a charge for air shipment.  As a result, Menlo pays Estes and bills the government for an amount that was computed using an air line haul amount, along with other air accessorial surcharges, even though both Menlo and Estes know that the lower applicable ground rate and ground accessorial surcharges should have been billed.  Menlo's other subcontractors (Doe Subcontractors), in addition to Estes, have similarly defrauded the government.

### E.   Examples of False Claims

72.   Thousands of false claims have been submitted by Defendants to the United States as described above.  Several examples are set forth herein.  For example, for Bill of Lading ("BOL") 12C69DJC, the government requested pick up at the San Joaquin Distribution Center ("SJDC") on Thursday, October 25, 2012, for delivery to Corpus Christi, Texas, by October 30, 2012.  Menlo billed the government and paid Estes an air shipment charge of  $541.22, but Estes paid only $163.53 to a separate carrier to ship the freight by ground.

73.   For BOL 12C69GJC, the government requested pick up at SJDC on October 25, 2012, for delivery to Anniston, Alabama, by October 30, 2012.  Menlo billed the government and paid Estes an air shipment charge of $877.63, but Estes paid only $354.81 to ship the freight by ground.

74.   For BOL 12C6A1JC, the government requested pick up at SJDC on October 25, 2012, for delivery to Fort Stewart, Georgia, by October 30, 2012.  Menlo billed the government and paid Estes an air shipment charge of $2,308.93, but Estes paid only $864.14 to ship the freight by ground.

75. Three additional examples involve shipments with pick up at the SJDC on Sunday, November 11, 2012, when the transportation was done by FedEx.  For BOL 12C99QJC, the government requested pick up at SJDC on November 11, 2012, for delivery to Holloman AFB, New Mexico, by November 15, 2012.  Menlo billed the government and paid Estes an air shipment charge of $1,342.77, but Estes only paid FedEx $636.56 to deliver the shipment by ground.

76.   For BOL 12C99RJC, the government requested pick up at SJDC on November 11, 2012, with delivery to Altus AFB, Oklahoma, by November 15, 2012.  Menlo billed the government and paid Estes an air shipment charge of $746.17, but Estes only paid FedEx $280.29 to deliver the shipment by ground.

77.   For BOL 12C99XJC, the government requested pick up at SJDC on November 11, 2012, with delivery to Gulfport, Mississippi, by November 16, 2012.  Menlo billed the government and paid Estes an air shipment charge of  $1,291.72, but Estes only paid FedEx

$572.82 to deliver the shipment by ground.

78.  Other examples show false claims for shipments from various military depots across the United States, all of which were billed using air rates when the shipments were actually transported by ground.  For example, for BOL 12A2ADBC, the government requested pick up from the Los Angeles, California depot DDBC, on Thursday, May 17, 2012, for next day delivery to Groton, Connecticut.  For this over-dimensional shipment, for which additional time for delivery was allowed, Menlo billed the government and paid Estes an air shipment charge of $10,148.31, but Estes paid only $1,701.13 to deliver the shipment by ground.

79.  The freight in BOL 12A2ADBC measured 48 inches in length, 52 inches in width, and 74 inches in height.  A height greater than 59 inches is allowed an oversize surcharge for an *air shipment*.  An air oversize surcharge amount was charged to the government at 30% of the base line haul amount of $6,303.30, or $1,890.99.  However, the freight's measurements did not meet the criteria for oversize in a *ground shipment*, which are 48 feet in length, 102 inches in width, and 162 inches in height.  Thus, for this shipment, the Defendants fraudulently charged the government for both an inflated line haul amount (for a supposed air delivery) and an inflated oversize surcharge (for a supposed oversized air delivery), when the freight was delivery by ground and did not qualify for a ground oversize surcharge.

80.  For BOL 12A11TBC, the government requested a pick up from DDBC on Wednesday, March 14, 2012, for next day delivery to Philadelphia, Pennsylvania.  For this over-dimensional shipment, for which additional time for delivery was allowed, Menlo billed the government and paid Estes an air shipment charge of $4,217.40, but Estes paid only $599.70 to deliver the shipment by ground.

81.  For BOL 11A1PPJF, the government requested a pick up from DDBC on Friday, April 8, 2011, for a 3-day delivery to Jacksonville, Florida.  Menlo billed the government and paid Estes an air shipment charge of $903.81, but Estes paid only $468.08 to deliver the shipment by ground.

82.  False billings were also submitted, for example, on shipments from Hill Air Force Base ("Hill AFB") in  Utah.  For BOL 216798O2, the government requested a pick up from Hill

AFB on Thursday, February 18, 2010, for a 2-day delivery to Atlanta, Georgia. Menlo billed the government and paid Estes an air shipment charge of $513.83, but Estes paid only $252.50 to deliver the shipment by ground.

83. For BOL 11AC4QHU, the government requested a pick up from Hill AFB on Friday, November 4, 2011, for a 3-day delivery to McGuire AFB, New Jersey. Menlo billed the government and paid Estes an air shipment charge of $525.16, but Estes paid only $208.08 to deliver the shipment by ground.

84. For BOL 11AC3GHU, the government requested a pick up from Hill AFB on Friday, November 4, 2011, for a 3-day delivery to Pittsburgh, Pennsylvania. Menlo billed the government and paid Estes an air shipment charge of $309.06, but Estes paid only $92.49 to deliver the shipment by ground.

85. Additional false billings were submitted, for example, on shipments from New Cumberland, Pennsylvania. For BOL 355289SP, the government requested a pick up from the New Cumberland depo on Thursday, October 14, 2010, for next day delivery to Sacramento, California. The destination site required an appointment for delivery, for which additional time for delivery was allowed. Menlo billed the government and paid Estes an air shipment charge of $1,988.19, but Estes paid only $694.23 to deliver the shipment by ground.

86. For BOL 12AYT1SP, the government requested a pick up from the New Cumberland depot on Wednesday, May 16, 2012, for a 2-day delivery to Dallas/Fort Worth, Texas. Menlo billed the government and paid Estes an air shipment charge of $913.02, but Estes paid only $169.04 to deliver the shipment by ground.

87. Additional examples demonstrate the Defendants' knowledge of false billings for air line haul charges, as well as air oversize surcharges, when the items were shipped by ground. For example, in BOL 14ACUKJC, the government requested a pick up of a item, an "angle, structural," from SJDC on Tuesday, April 8, 2014, for delivery to the Fleet Industrial Supply Center, in Portsmouth, Virginia. It measured 288 inches in length, 3 inches in width, and 3 inches in height. In an email, dated April 8, 2014, Glenn Privette ("Privette"), Operations - Estes Forwarding Worldwide, notified Anthony Marinaro ("Marinaro"), Transportation Manager -

Menlo Government Services, that the shipment was too long for delivery by air: "The above listed VLO is too long to fly commercially...."  Marinaro replied in an email that same day that he had spoken to the pick up base and received permission for a later delivery date, allowing 6 days, from Tuesday, April 8, to Monday, April 14: "I just spoke to DDJC and Monday is approved."

88.  Estes shipped the item by ground.  Irrespective of the fact that both Menlo and Estes knew that the item was too long to be moved by air, Estes billed Menlo, and Menlo paid Estes, for an air line haul amount ($96.41), an air fuel surcharge rate of 27% of the air line haul amount ($26.03), and an air oversize surcharge rate of 30% of the air line haul amount ($28.92).  Thus, the total amount billed was $151.36.  However, Estes' costs for the shipment were only $2.55, which included a credit, or discount, of $92.25, believed to be related to its affiliated company, Estes Express Lines.  The freight, with a length of 288 inches, did not even qualify as oversized for ground delivery, for which the item must measure greater than 576 inches in length.

89.  Two additional examples of false billings for both air line haul amounts and air surcharges consist of identical freight shipped from SJDC to different, but close, destinations.  In an email, dated April 15, 2014, Privette informed Marinaro that: "These 2 shipments are too heavy to fly commercially and too tall to fly on cargo...".  He stated that: "I can have them there on Monday, 4/21," six days after pick-up.  Marinaro replied that he would "add tracking events."  The two identical items were described as "BAND SAW, AIRCRAFT E."  One item, Shipment HWJ2J202519461615, hereafter referred to as "Shipment 1615," was to be delivered to the Material Processing Center in Norfolk, Virginia, on April 21, 2014.  The second item, Shipment HWJ2J202519461611, hereafter referred to as "Shipment 1611," was to be delivered to the Naval Weapons Station outside Williamsburg, Virginia, on April 21, 2014.

90.  For Shipment 1615, Estes paid its third party shippers a total of $570.45 to deliver the item by ground and charged a total of $1,793.40 for shipment by air, which Menlo paid.  Estes' charge included an air fuel surcharge of $308.42, or 27% of the air line haul amount of $1,142.29.  It also included an air oversized surcharge of $342.69, or 30% of the air line haul amount.  For Shipment 1611, Estes paid its third party shippers a total of $678.98 and charged a

total of $1,793.40 for shipment by air, which Menlo paid.  Estes' charge included an air fuel surcharge of $308.42, or 27% of the air line haul amount of $1,142.29, and an air oversize surcharge of $342.69, or 30% of the air line haul amount.  As both Menlo and Estes knew, these two ground shipments were fraudulently charged to the government as *air* shipments, with *air* fuel surcharges, and *air* oversized surcharges. Yet none of the shipments even met the qualifications for a ground oversized surcharge.

91.  As another example, on April 19, 2010, James Ford (Estes) sent an email to Shannon Booth (Estes) with a cc to Lisa Flores (Menlo) regarding freight to be shipped.  Ford asks Booth about the freight.  Booth states that the freight is oversized and provides to Ford and Flores the specific freight dimensions.  Ford then emails Flores with a cc to Booth and states:

> Lisa -
>
> 194 length!  I cannot fly this. **Will have to move ground.**  Looking at … a 3 to 4 business day transit.

(emphasis added).  Flores (Menlo) responds:

> No just get it there as soon as you can, do you need me to add the 520 [an oversize surcharge] if it's going ground???

Ford (Estes) responds: "Yes."  Flores (Menlo) then states:

> "**Resending back to you as a 3-day air with 520 added**."

(emphasis added).  The email exchange reflects Defendants' lack of concern for how the government will be charged under the DTCI Contract.  Both Estes and Menlo know, as they state, that this freight will be delivered by ground because it is too large for delivery by air.  Nonetheless, Menlo offers to re-send the tender to Estes as an *air delivery*, and to also include an oversized accessorial surcharge, even though the dimensions do not qualify for a ground oversized surcharge and both Menlo and Estes know the freight will be delivered by ground.

92.  In order to comply with the DTCI Contract and Regulations, whenever the mode of transportation is changed from air to ground, the lower ground shipment rates must be applied.  *Contract, Part I, Section G-7* (emphasis added) ("The contractor shall invoice for the actual cost of transportation, ***taking into consideration any achieved optimization opportunities***, up to the transportation NTE rate established in the BoL, **or the revised transportation NTE rate if a**

1  **mode change results.")**.  Defendants did not notify the government of such mode changes and

2  the lower rates that should apply.

3      93.  Furthermore, Contract terms require Menlo to complete a pre-audit of all carrier

4  invoices.  *Contract, Performance Work Statement, Part 1, Section C § 1.4.4.5.*  Such carrier

5  invoices must be audited accurately for several factors, including but not limited to,  the

6  "contractor's contracted rates."  *Contract, Performance Work Statement, Part 1, Section C §*

7  *1.4.4.5.2.1.*  Finally, FAR 52.203-13(b)(3)(i)(B) requires Menlo to "timely disclose in writing to

8  the Inspector General, with a copy to the Contracting Office whenever, in connection with the

9  award, performance, or closeout of the Contract or any subcontract thereunder, the Contractor

10  has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has

11  committed . . . [a] violation of the civil False Claims Act."

12      94.  Defendants are aware of the DTCI Contract requirements, the FCA, and their

13  responsibilities under the law.  Michael Nadolski, Menlo's Director of Contracts, explained his

14  understanding of the DTCI Contract when he testified under oath, under penalty of perjury, in an

15  arbitration deposition in July 2011.  Nadolski testified that when Menlo receives a shipment

16  order from the Government with a mandatory delivery date, it tenders an offer to one of Menlo's

17  subcontractors, and includes "a particular mode" in the tender:

18        MDD dates are determined -- they are mandatory delivery dates.  They are
19        established by the government.  What they mean is that is the date on which the
      government requires the particular shipment to be at the receiving installation.
      Menlo manages to those MDDs.  Those MDDs, once established by the
20        government, we use **in order to establish a particular mode and level of**
      **service that is required to meet that MDD.**

21
22  *Transcript of Deposition of Michael Nadolski in Menlo Worldwide Government Services, LLC v.*

*Limitless International, Inc., dated July 20, 2011, in JAMS Ref: 1100063090 ("Nadolski Depo"),*
23
*at 66-67* (emphasis added).
24
25      95.  Nadolski then explained that a subcontractor is not entitled to receive payment based

26  on the tender from Menlo, but rather only based on the actual shipment provided:

27        That if they accept -- accepted the shipment, we would calculate the estimated
      cost of that shipment based on service requested.  That was the basic -- one side
      of the basis for use of those rates.  The other side was to be used for invoicing, at
28        which point **we expected to be invoiced for the services that were actually**

**provided, irrespective of what was requested.**

.        .        .

**I would expect that the carrier would invoice based on the service that was actually provided.**

.        .        .

Within the contract and within the FAR, there is a concept of allowable costs and payment.  Part of that has to do with what's reasonable, what's allowable, what's allocable to a particular transaction.  **Under the reasonable standard is the test of did that rate correspond to the services actually provided.**

*Nadolski Depo, at 173-75* (emphasis added).

96.  Nadolski then states that to charge otherwise, for a service that was not provided, is a violation of the FCA:

That's important because **to continue to charge a higher rate than the services provided, knowing that the Government is not being charged appropriately under the FAR, creates a violation of the False Claims Act**, which then subjects the company and the individuals to certain charges and criminal actions or civil actions for mischarging the Government.

*Nadolski Depo, at 176* (emphasis added).  The DTCI Contract and Regulations are clear, and Nadolski was clear about them.  The Government could be charged only for the "services actually provided" and the actual costs of shipment, based on the actual mode of delivery.  To "continue to charge a higher rate than the services provided, knowing that the Government is not being charged appropriately ... creates a violation of the False Claims Act."  That is precisely the fraudulent conduct in which Defendants have engaged.

97.  Defendants' knowingly fraudulent and false billings under the Contract and Regulations are violations of the FCA and have resulted in substantial losses to the government.

**F.  Retaliation Against Relator Cuellar**

98.  Marcelo Cuellar was terminated by Estes on February 10, 2015.  On that day, he was called into a meeting with three of Estes' attorneys, including Cheryl Barnes ("Barnes") and Thomas Coulter, who came to the Tracy depot where Cuellar worked.  Estes' counsel  informed Cuellar that they wanted to ask him questions because Estes had received a subpoena from the government and they were interviewing employees about the matters included in the subpoena. The attorneys confronted Cuellar with several screen shots of folders on his work computer.

They demanded that Cuellar explain what was in each of the folders.

99.  Cuellar explained the contents of each of the folders and the attorneys asked Cuellar if he had sent any of the contents of those folders to anyone other than Defendant Menlo.  In responding to one question, Cuellar stated that at his prior job, he sent all freight by air as he was trained to do.  That process changed when he was hired by Estes.  Cuellar stated that he was trained at Estes to, whenever possible and particularly on Thursday and Friday, put the freight for shipment on a truck.

100.  Immediately after his meeting with the attorneys concluded, Cuellar was approached by Barnes who informed Cuellar that this was his last day of work at Estes.  Barnes told Cuellar that he was being terminated supposedly because he had: (1) taken vacation time in May 2015 for which he was paid (but supposedly should not have been) and (2) declined supervisor Todd Pierchal's ("Pierchal's") verbal request in late January to attend a training course in Virginia.

101.  The reasons given for Cuellar's termination are entirely pretextual.  The real reason Cuellar was terminated was because he assisted the government in putting a stop to the fraud.

102.  Prior to taking the vacation time noted by Barnes, Cuellar had given a written leave request to his supervisor, Tim Joachim, who had signed the request indicating that the leave was approved.

103.  Concerning the training course, Cuellar had been attending the University of Phoenix after work since October 2013 and had informed Estes of this when he started the school program.  When Pierchal requested that Cuellar attend one particular training in Virginia, Cuellar explained to Pierchal that he had classes each Wednesday, and had school assignment meetings that he would need to attend.  If he did not do so, he would not receive school credit.  Pierchal did not require Cuellar to attend the training because it would conflict with his school work, and Cuellar received no further comments from anyone at Estes regarding the Virginia training until the day he was terminated.

104.  Estes knew or suspected that Cuellar had furnished the government with information about Estes' fraud, which led to Estes' receipt of a government subpoena.  Estes

terminated Cuellar in retaliation for blowing the whistle on the fraud.  Defendant Estes' conduct, as set forth above, violates the FCA, federal and California public policy, and California Labor Code § 1102.5.

## Count I

### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B)

### (Against All Defendants)

105.  Relators repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

106.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

107.  Through the acts described above, Defendants have knowingly presented or caused to be presented, false or fraudulent claims for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

108.  Through the acts described above, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

109.  The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

110.  As a result of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

111.  Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B) as described herein.

**Count II**

**False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

**(Against All Defendants)**

112.  Relators repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

113.  This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

114.  Through the acts described above, Defendants and Doe Defendants, acting together in concert, conspired to defraud the United States within the meaning of 31 U.S.C. § 3729(a)(1)(C).

115.  As a result, the United States, unaware of the fraudulent conduct of Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

116.  By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

117.  Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(C) as described herein.

**Count III**

**False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

**(Against All Defendants)**

118.  Relators repeat and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

119.  This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

120.  Through the acts described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States within the

meaning of 31 U.S.C. § 3729(a)(1)(G).

121.  As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the Defendants, and the United States sustained costs and damages.

122.  By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

123.  Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(G) as described herein.

**Count IV**

**False Claims Act - Retaliation**
**31 U.S.C. § 3730(h)**

**(Against Estes)**

124.  Relator repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

125.  Through investigating and reporting the fraudulent conduct of Defendants, Relator was terminated by Defendant Estes, because of lawful acts done by the Relator in furtherance of an action under section 31 U.S.C. § 3729.

126.  Relator is entitled to all relief necessary to make him whole, including reinstatement with the same seniority to the position he had before the unlawful termination, 2 times the amount of back pay lost, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination.

**Count V**

**Wrongful Termination in Violation of Public Policy**
**and California Labor Code § 1102.5**

**(Against Estes)**

127.  Relator John Doe repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

128.  In doing the things herein alleged, Defendant Estes threatened, harassed, and discriminated against Relator in the terms and condition of his employment and ultimately

terminated that employment.

129.  This conduct was in violation of public policies pursuant to various state and federal laws, and to punish Relator for his opposition to Estes' fraudulent and illegal practices.

130.  In doing the things herein alleged, Defendant violated California Labor Code § 1102.5 by retaliating against Relator and ultimately terminating his employment.

131.  As a direct and proximate cause of Defendants' wrongful conduct, Relator has sustained and will sustain the loss of salary, as well as interest thereon.  Relator has also suffered other damages, including, but not limited to, valuable employee benefits.  Additionally, the actions of Defendant were carried out in a deliberate manner in conscious disregard of the rights of Relator and were malicious, despicable, and were intended to harm him.  Relator is therefore entitled to punitive damages against Defendant in an amount sufficient to punish Defendant, and to deter future similar misconduct.

**PRAYER FOR RELIEF**

WHEREFORE, Relators pray for judgment against the Defendants as follows:

1.  That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 et seq.;

2.  That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3.  That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4.  That, as a result of Defendant's unlawful employment actions, Relator Cuellar receive all relief necessary to make him whole pursuant to federal and state causes of action for wrongful employment conduct, retaliation, and termination, including 31 U.S.C. § 3730(h);

5.  That, as a result of Defendant's violation of public policy and violation of California Labor Code § 1102.5, Relator Cuellar  receive all relief necessary to make him whole;

6.  That Defendant Estes pay exemplary damages in an amount sufficient to punish said Defendant and to deter future similar misconduct;

1    7. That Relators be awarded all costs of this action, including attorneys' fees, costs and

2  expenses; and

3    8. That Relators recover such other and further relief as the Court deems just and proper.

4                              **DEMAND FOR JURY TRIAL**

5    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a

6  trial by jury.

7

8  Dated: 2|9|16

Michael A. Hirst, Esq.

9  HIRST LAW GROUP, P.C.

200 B. Street, Suite A

10  Davis, CA 95616

Tel:  530-756-7700

11  Fax:  530-756-7707

michael.hirst@hirstlawgroup.com

12

Counsel for Plaintiffs/Relators

13  Richard Ricks and Marcelo Cuellar

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint Filed Under Seal            34